**In the United States District Court
for the District of Kansas**

---

Case No. 23-cv-02154-TC

---

JOHN J. SIGG,

*Plaintiff*

v.

BRYAN J. MURPHY, IN HIS OFFICIAL CAPACITY AS
ALLEN COUNTY SHERIFF, JOSEPH STOTLER, & BOARD OF
COUNTY COMMISSIONERS OF ALLEN COUNTY, KANSAS

*Defendants*

---

**MEMORANDUM AND ORDER**

John J. Sigg sued Deputy Joseph Stotler, Sheriff Bryan J. Murphy in his official capacity, and the Board of County Commissioners of Allen County, Kansas, alleging that Stotler used excessive force when he tased Sigg and that the Sheriff and County are liable for failing to train Stotler and/or ratifying his conduct. Doc. 1. Stotler moved for summary judgment on the basis of qualified immunity. Doc. 48. Murphy and the County moved separately for summary judgment. Doc. 49. For the following reasons, Stotler's motion for summary judgment is denied, but Murphy and the County's motion is granted.

**I**

**A**

Defendants have filed motions for summary judgment. And the individuals invoke the protections of qualified immunity. Each has particularized standards.

**1.** Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to

1

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, a court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

In a case where the moving party does not bear the burden of persuasion at trial, the summary judgment rules require that party to show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

But in a case where the moving party will bear the burden of proof at trial on a particular issue, the moving party must meet "a more stringent summary judgment standard." *Pelt*, 539 F.3d at 1280; *see also Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015) (discussing a movant with affirmative defenses). That standard requires the movant to "establish, as a matter of law, all essential elements of the issue." *Pelt*, 539 F.3d at 1280. Only then must the nonmovant "bring forward any specific facts alleged to rebut the movant's case." *Id.*

**2.** The individual defendants' summary judgment motions are based, at least in part, on the doctrine of qualified immunity. The Supreme Court and Tenth Circuit have explained how that doctrine works at the summary judgment stage.

Qualified immunity attempts to balance competing interests. Suits against government actors allow those wronged by government misconduct a method of redress. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). But non-meritorious suits exact a high cost from society and government officials by unduly interfering with the discharge of official duties. *See id.*; *see also Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277 (10th Cir. 1998). So government officials performing discretionary duties are immune from suit when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (recognizing municipalities may not rely on their officers' entitlement to qualified immunity). Whether an official is immune turns on the objective reasonableness of the official's actions, considering the laws clearly established at the time the official acted. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Objective reasonableness is not an exacting standard; qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *See White v. Pauly*, 580 U.S. 73, 79 (2017); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Once a defendant asserts entitlement to summary judgment on the basis of qualified immunity, the plaintiff has the burden to prove two things. First, that a jury could find the defendant's conduct violated the Constitution or laws of the United States. *Packard v. Budaj*, 86 F.4th 859, 864 (10th Cir. 2023). Second, the law must have been clearly established at the time of the alleged conduct such that the defendant had fair notice that his or her conduct was unlawful. *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). If both inquiries are answered in the affirmative, summary judgment must be denied unless the defendant proves "there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *See Emmet v. Armstrong*, 973 F.3d 1127, 1132 (10th Cir. 2020) (internal quotation marks and citations omitted).

**B**

This case arises out of an encounter where an Allen County Sheriff's deputy, Joseph Stotler, tased an 80-year-old driver, John Sigg. That encounter happened after Sigg led police across his small Kansas town on a car chase that never topped 40 miles per hour.

Sigg sued Stotler for violating his constitutional right to be free from excessive force. He also sued Stotler's boss, Sheriff Bryan Murphy in his official capacity, and the Board of County Commissioners of Allen County, Kansas for failing to train Stotler and/or ratifying his conduct. *See* Docs. 9 and 45.[1]

**1.** On the late afternoon of April 16, Iola Police Officer Brandon Andres clocked Sigg driving 38 miles per hour in an area with a 35 mile per hour speed limit. Doc. 45 at ¶2.a.i, iii. Officer Andres tried to stop Sigg, but Sigg kept driving. *Id.* at ¶ 2.a.iii–v. Sigg led Officer Andres through town toward an auto dealership owned by Sigg's family. *Id.* While driving, Sigg committed at least seven additional traffic infractions, including failing to signal turns, failing to maintain his lane, and failing to stop at stop signs, according to Andres's report. Doc. 48-3 at 1. During the course of this pursuit, speeds never exceeded 40 miles per hour. Doc. 48-3 at 1.

Several other patrol cars and officers from multiple jurisdictions joined the roughly one-mile pursuit. Doc. 54 at ¶ 30. These officers were available because four different law enforcement agencies were in Iola that day for a saturation patrol exercise. Doc. 45 at ¶ 2.a.ii. Stotler, a deputy with the Allen County Sheriff's Department, was among them. Doc. 54 at ¶ 3. When the pursuit began, Stotler was outside of Iola, but drove nearly 100 miles per hour to get into town so that he could join the slow-moving chase of Sigg. Doc. 54 at ¶ 29.

---

[1] Since Stotler, Murphy, and the County request summary judgment, the facts, including Stotler's body camera video, are viewed in the light most favorable to Sigg. And the body cam video arguably supports Sigg's version of events. *Compare Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020) (reversing the grant of summary judgment on an excessive force claim because video of the arrest showed that a jury could find it was not objectively reasonable for the officer to deploy his taser) *with Scott v. Harris,* 550 U.S. 372, 378–81 (2007) (holding that a court may rely on unequivocal facts from a video on summary judgment).

Stotler arrived from the opposite direction and, as he passed Sigg, he got a good enough look to report over his radio that the driver was an "elderly gentleman." Doc. 54-2 at 22:38:17–20.

Less than a minute after Stotler joined the pursuit, Sigg arrived at the dealership and got out of his car. *See* Doc. 54-2 at 22:39:04. The 20-some officers tailing him did the same. Doc. 48 at ¶ 9, Doc. 54 at ¶ 51. Stotler was not first on the scene. Doc. 54-2 at 22:39:10. One officer was closer and walking towards Sigg when Stotler ran up and passed that officer, pointed his taser at Sigg and barked at Sigg to "get on the fucking ground." Doc. 54-2 at 22:39:10–13. And another officer is seen on Stotler's body camera footage walking toward Sigg on the opposite side. *Id.* at 22:39:18.

Several officers issued commands—many of them conflicting—to Sigg. Doc. 54-2 at 22:39:10–21. Stotler issued five commands over ten seconds for Sigg to get down. *Id.* Simultaneously, at least two other officers told Sigg to put his hands up. *Id.* In the midst of these commands, Sigg appeared to ask questions and was otherwise confused about his encounter with the officers as he raised his hands in compliance with officer commands. *Id.* After he raised his hands, Sigg began to lower his hands and lean forward, ostensibly to get on the ground to comply with Stotler's commands. *Id.*; Doc. 54 at ¶ 13.

Although Sigg was alone, surrounded by 20 officers, and was attempting to comply with the officers' conflicting demands, Stotler tasered Sigg. This occurred less than 20 seconds after Stotler exited his patrol car. Doc. 54-2 at 22:39:05–22. Doc. 54-2 at 22:39:04–22. At the time, Sigg was 80 years old, Doc. 45 at ¶ 2.a.vii. and weighed 145 pounds, Doc. 54 at ¶ 52. Stotler, by way of comparison, is 6'2" and approximately 250 pounds. Doc. 54 at ¶ 52. In his deposition, Stotler claimed Sigg was wearing a "long coat," implying that he believed Sigg may have been reaching for something obscured by a long coat. *See* Doc. 48-5 at 10. But Stotler's body cam footage undermines that contention: Sigg was wearing a waist-length jacket which was left open. Doc. 54-2 at 22:39:18.

The other officers responded very differently. Stotler's ride-along partner, for example, initially drew his side-arm. Doc. 54 at ¶ 46. But he perceived no threat from Sigg, so he holstered it before Stotler tased Sigg. *Id.* at ¶ 47. Another officer also pulled out his taser, but holstered it when he realized Sigg was unarmed. *Id.* at ¶ 49. That officer had

5

planned to "grab [Sigg] from behind as we had several officers on scene and available to overpower [Sigg] into cuffs." *Id.*

When Sigg asked Stotler why he was tased, Stotler said because "you ran from us." Doc. 54-2 at 22:39:59–22:40:01. Yet Stotler admitted on the scene to his colleagues that he did not even know why Sigg was being stopped or pursued by officers. Doc. 54 at ¶¶ 36–37. One deputy replied to Stotler after learning of the tasing, "OK, good." Doc. 55 at ¶ 55. Another just laughed. *Id.* at ¶ 57. In a separate exchange, the Sheriff simply told Stotler to "let it go," Doc. 54-2 at 22:44:34–35.

**2.** Stotler had been on the force for just over a year when he tased Sigg. Doc. 50 at ¶ 3. He received approximately 560 hours of training, much of it from the police academy at the Kansas Law Enforcement Training Center. *Id.* at ¶¶ 4,5. He received about eight hours of taser training from the police academy. *Id.* at ¶ 7. Stotler received an additional eight hours of training from a taser instructor, provided by the Allen County Sheriff's Department. *Id.* at ¶ 8. Officer taser training is comprehensive: trainees learn about the physical impact of tasers and tactical considerations and are each tased. *See id.* at ¶¶ 9–12. At the conclusion of his training, Stotler received his taser certification. *Id.* at ¶ 13. But Stotler says he never got a copy of the Sheriff's taser policy. Doc. 55 at ¶ 34.

Despite his limited time on the force, Stotler had tased another person two months before he tased Sigg. Doc. 55 at ¶ 91. Sigg said the preceding tasing incident violated force policy because the target was driving. *Id.* But there is no underlying evidence provided about that particular incident. *Compare id. with* Doc. 59 at 7–8.

**3.** Generally speaking, the Sigg family has a contentious relationship with the Allen County law enforcement community. Indeed, the family has been involved in numerous legal battles with the County over the prior decades. *See, e.g., Sigg v. Allen Cnty.*, No. 15-CV-01007, 2016 WL 6716085 (D. Kan. Nov. 15, 2016), *aff'd sub nom. Sigg v. Allen Cnty., Kansas, Bd. of Cnty. Commissioners*, 712 F. App'x 738 (10th Cir. 2017) (relating to John M. Sigg and Mitchell Sigg), *Sigg v. Bd. of Cnty. Comm'rs*, No. 98-2154-JWL, 1999 WL 588186 (D. Kan. July 30, 1999) (relating to John Sigg); *see also* Doc. 54-2 at 22:44:10–24 (an exchange with bystanders at Sigg auto suggesting that the officers were chasing Sigg for "no reason" because it was "Friday night."). Officer Smith claims that he once had to physically restrain Sigg when he acted violently in a court proceeding, Doc. 50-4 at 3, but Sigg says that he has

never been in an altercation with officers and Smith is remembering an encounter between Smith and Sigg's son, Doc. 55 at 18.

And the undisputed facts show that many of the officers, including Stotler, knew John Sigg or his family members to one degree or another. *See* Doc. 54-2 at 22:40:45–43:45 (officers calling Sigg "John" and "the dad"). Andres wrote that his long-standing relationship with Sigg increased his concern for Sigg's medical well-being after he was tased since Sigg appeared not to recognize Andres. Doc. 54-9 at 2.

In fact, Stotler had purchased a minivan from Sigg Motors in 2019. Doc. 54 at ¶ 55. Sigg's automotive company had repossessed the minivan from Stotler just it just 18 days prior to Stotler tasing Sigg. *Id.* at ¶¶ 56–57. This was because Stotler had fallen behind in payments on the van. *Id.* at ¶ 56.

**4.** Sigg's claims against Stotler and the County rely on 42 U.S.C. § 1983. Doc. 45 at 1.d. Specifically, Sigg alleges that his Fourth Amendment constitutional right to be free from excessive force was violated when Stotler, acting in his individual capacity, tased him. *See* Doc. 45 at 4.a. He also alleges that the Sheriff, acting in his official capacity, and the County bear responsibility under two separate theories of liability. Doc. 55 at 18. First, Sigg says the County failed to train its officers, including Stotler, on tasers. *Id.* Second, Sigg claims that Sheriff Murphy ratified Stotler's unconstitutional conduct. *Id.*

Stotler claims that he is entitled to qualified immunity. Stotler says that his actions were not objectively unreasonable because Sigg feloniously led officers on a chase across town. Doc. 48 at 8–13. And even if it had been unreasonable to tase Sigg, it was not clearly established that use of a taser in these circumstances was unconstitutional. *Id.* at 13–15. The Sheriff and the County say that Sigg failed to present sufficient evidence showing that officer training on tasers is inadequate, Doc. 50, and that the ratification theory lacks merit because Sigg failed to preserve it and, even if he had, there is no evidence to support the claim, Doc. 59 at 13–15.

## II

The facts viewed in the light most favorable to Sigg support the conclusion that Stotler used excessive force when he tased Sigg in violation of clearly established Fourth Amendment law. But there is no basis to find that the Sheriff and/or County violated Sigg's

constitutional rights. As a result, Stotler's motion for summary judgment is denied, but the County and Sheriff are entitled to judgment as a matter of law.

### A

Stotler is not entitled to qualified immunity. Sigg meets his burden to show that a jury could find Stotler's use of force was excessive. And it was clearly established in the Tenth Circuit at the time that tasing a non-violent, non-threatening offender without warning violates the Fourth Amendment.

### 1

In the context of an arrest or investigatory stop, the Fourth Amendment has been construed to preclude the use of excessive force. *Est. of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014); *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018) (citing *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)). An application of force is "excessive" if it was "not 'objectively reasonable' in light of the facts and circumstances." *McCowan v. Morales*, 945 F.3d 1276, 1283 (10th Cir.2019). Objective reasonableness is a product of both "the nature and quality of intrusion" and "the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). *Graham* identified several nonexclusive factors to aid in that inquiry, including "the severity of the crime at issue," "whether the suspect poses an immediate threat to the safety of the officers or others," and "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Not every push or shove—even though it may later seem unnecessary in the peace of a judge's chambers—violates the Fourth Amendment. *Graham*, 490 U.S. at 396. Since the standard is objective, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020). That reconstructed perspective should account for the "*full encounter*, from inception through the moment the officers employed force." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 765 (10th Cir. 2021) (emphasis in original).

In tasing Sigg, a jury could find Stotler applied unreasonable force. All three *Graham* factors weigh in Sigg's favor.

8

First, severity of the crime, weighs in favor of Sigg. The Tenth Circuit has said that the first *Graham* factor weighs against the plaintiff where he has committed a felony, even if that felony is non-violent. *Est. of George v. City of Rifle*, 85 F.4th 1300, 1316 (10th Cir. 2023) (citing *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021)).

The parties dispute whether Sigg committed a felony. *See* Doc. 48 at 10–11, Doc. 54 at 20. Sigg's predicate offense here was speeding: he was driving 38 miles per hour in a 35 mile per hour zone. This is not a felony under Kansas law. But Sigg did not pull over after the officer activated his lights. Instead, he led officers on a low-speed chase, committing at least seven additional traffic infractions as he did so. Doc. 48 at ¶ 8, Doc. 54 at ¶ 7. Stotler says these infractions transformed Sigg's speeding violation into felony fleeing in violation of K.S.A. § 8-1568. *See* Doc. 48 at n.2. But Sigg says he was never charged with felony fleeing and he only pled guilty to a misdemeanor. Doc. 54 at 20.

Even if Sigg had been charged with a felony, that would not end the inquiry. *Graham* instructs courts to examine the severity of the crime in context with "what an officer knows or suspects at the time of the use of force." *See Est. of Taylor*, 16 F.4th at 763–64 (weighing the first factor for the plaintiff when the possible offense could have been either a misdemeanor or a felony or no crime at all). Stotler knew that Sigg refused to stop for police, and that multiple patrol cars pursued him. Doc. 54 at ¶¶ 30, 31. But he did not know why they pursued Sigg, and when Stotler joined the chase, he did not witness Sigg's traffic infractions. See Doc. 54 at ¶¶ 29–31, 36–37. In addition, there is no indication that anyone believed Sigg had done anything suggesting violent conduct or otherwise threatened the officers' safety. Put simply, the facts—viewed in the light most favorable to Sigg—suggest that he was being pursued by twenty officers for operating a motor vehicle three miles per hour over the posted speed limit.

This makes the felony fleeing in *Hansen v. Dailey* distinguishable. *Contra* Doc. 48 at 11. In *Hansen*, the plaintiff led officers on a dangerous, high-speed chase, failed to yield at multiple red lights and stop signs, and drove on the wrong side of the road before crashing. No. 21-3235, 2023 WL 7212155, at *3 (10th Cir. Nov. 2, 2023). In contrast, Sigg's speed never reached 40 miles per hour, his violations of the traffic laws were relatively minor, and he placed no one's safety at risk. On these particular facts, a jury could find that Sigg's "crime was not severe," but no similar conclusion was possible for *Hansen. Id.* at *3.

9

The second *Graham* factor also weighs in Sigg's favor. This factor considers "whether the suspect posed an immediate threat to the safety of the officers or others[ and] is undoubtedly the most important." *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (internal citations and quotations omitted). The threat must be immediate, so a court "must look at whether the officers [or others] were in danger at the precise moment that they used force." *Emmett v. Armstrong*, 973 F.3d 1127, 1136 (10th Cir. 2020) (internal quotations and citations omitted). The Tenth Circuit has suggested that courts should consider the circumstances surrounding the encounter, including things like whether the suspect was given orders and the suspect's compliance with the orders, whether any hostile motions were made toward the officers, the physical distance between the officers and the suspect, and the manifest intentions of the suspect. *Est. of George v. City of Rifle*, 85 F.4th 1300, 1317 (10th Cir. 2023) (internal quotations and citations omitted); *Palacios v. Fortuna*, 61 F.4th 1248 (10th Cir. 2023) (citing *Est. of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2008)).

Viewing the facts in the light most favorable to Sigg, there was no threat to the officers' safety. Sigg was unarmed and trying to comply with conflicting demands from multiple officers who had him surrounded. When he was tased, his hands were up in compliance with one officer's commands and he appeared to be trying to get down to the ground in compliance with Stotler's commands. Doc. 54-2 at 22:39:04–39.

In addition, Sigg made no hostile motions toward the officers. Stotler claims that Sigg started to lower his hands and so he was not required to wait to see if Sigg would pull out a weapon before tasing him. Doc. 48 at 12–13. But Stotler's body cam contradicts that assertion: it shows an elderly man, surrounded by officers, attempting to comply with conflicting commands to keep his hands up in the air while getting down to the ground. Even Stotler acknowledged it would be a significant physical feat for an 80-year-old to simultaneously do both. *See* Doc. 54 at ¶ 54.

Neither party identifies the distance between Stotler and Sigg. It appears somewhere between 7 and 20 feet, which could heighten the immediacy of danger. *See Palacios v. Fortuna*, 61 F.4th 1248, 1260 (10th Cir. 2023). But that danger is minimal based on the setting: multiple officers had an unarmed elderly man whose arms were in the air surrounded in broad daylight with no one else in the vicinity.

And, Sigg's "manifest intentions" before Stotler tased him were nonthreatening. *See Palacios*, 61 F.4th at 1260 (explaining that the suspect's manifest intentions are judged by "how a reasonable officer on the scene would have assessed the manifest indicators of [the suspect's] intentions."). That conclusion is clear from Stotler's body cam footage, and it is the same one reached by other officers on the scene. Two other officers had decided to holster their weapons in the seconds before Stotler tasered Sigg. Doc. 54 at ¶¶ 47, 49. In other words, two other deputies in this very situation perceived Sigg's actions as nonhostile. Thus, the second *Graham* factor weighs in favor of Sigg. *See Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012) (weighing the second factor in favor of a large man, who "carried no weapon, made no overt threats, and did not get within reach of (the officer)").

The third *Graham* factor, actively resisting arrest or attempting to evade arrest by flight, also favors Sigg. It is undoubtedly true, as Stotler argues, that Sigg did not pull over when the officer attempted to stop him for speeding, choosing instead to meander through town until he arrived at his car dealership's parking lot. Doc. 48 at 11-13. That was both unwise and unlawful. But the chase is irrelevant to the inquiry because Sigg had surrendered before he was tased. *See Emmett*, 973 F.3d at 1136 (weighing the third factor against the officer, since "any attempt to flee had been effectively subverted" in the "precise moment" that the suspect was tased). Once in the parking lot, Sigg did not resist arrest. He was out of the car, unarmed, and surrounded by several officers, his hands were up, and the video confirms that he is trying to figure out how to get down on the ground. And Stotler's body cam shows that no lesser degree of force was attempted to obtain control. *Cf. Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (use of taser was reasonable when lesser force to simply restrain the suspect during arrest was insufficient since the suspect began "kicking his feet, flailing his arms, and biting the officer.").

An additional circumstance also indicates that Stotler's actions were not objectively reasonable here. Stotler failed to warn Sigg he was about to use his taser. Such a warning is critical: the goal is to exact compliance, not to tase. *See Emmett v. Armstrong,* 973 F.3d 1127, 1137–38 (10th Cir. 2020); *see also Heard v. Dulayev*, 29 F.4th 1195, 1205 (10th Cir. 2022) (granting qualified immunity where an officer warned the suspect that he would be tased and the suspect acknowledged the warning but continued to ignore commands). Stotler's failure to warn weighs against a finding that the force being used was reasonable.

\* \* \*

A jury could certainly find that Stotler's tasering Sigg was an unreasonable use of force. First, Sigg's "crime" is not clearly severe. Second, the 80-year-old Sigg posed no immediate threat to officers at the time he was tased: he was standing still and surrounded by officers, some of whom holstered their weapons in the seconds before Stotler tased Sigg. Third, Sigg was not fleeing but trying to comply with conflicting officer demands to keep his hands up and get on the ground. Fourth, Stotler never warned Sigg that he was about to be tased and a failure to warn is generally unreasonable in the Tenth Circuit. *See Emmett*, 973 F.3d at 1137–38 (concluding that it was clearly established in 2013 that using a taser without providing a warning against a misdemeanant who had ceased actively arresting was unconstitutional). Thus, the first prong of the qualified immunity analysis shows a jury could find that Stotler's tasering of Sigg was excessive and unreasonable.

**2**

Having found that a jury could find that Stotler violated Sigg's constitutional rights, the next question is whether the law was clearly established. Discerning whether the relevant legal rule was clearly established is a narrow and context-specific exercise. *See City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). In short, the precise contours of the legal right must have been so clear that every reasonable official in that circumstance would have understood what he or she was doing violated that right, leaving no debate as to the lawfulness of the conduct in the particular situation. *See Mullenix v. Luna*, 577 U.S. 7, 13–14 (2015); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011); *see also Rivas-Villegas*, 595 U.S. at 5-8 (reversing a denial of qualified immunity where the precedent relied upon had "materially distinguishable" facts that "did not give fair notice" to the official).

Practically, this means a "Supreme Court or Tenth Circuit decision" must have held that the same conduct (or very nearly the same conduct) as the conduct at issue is a violation of law. *Wise v. Caffey*, 72

F.4th 1199, 1209 (10th Cir. 2023).[2] To be sure, a case "directly on point" is not necessary for a right to be clearly established, but existing precedent must have placed the constitutional question "beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). In the context of a Fourth Amendment excessive force claim, this means that plaintiffs must show "that objectively reasonable officers could not have [ ] thought the force [used] was constitutionally permissible." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007).

Stotler is not entitled to qualified immunity because Tenth Circuit precedent clearly established that officers cannot tase a non-violent, nonthreatening target without warning. *See Emmett v. Armstrong*, 973 F.3d 1127, 1137 (10th Cir. 2020). This rule has been clearly established for nearly two decades. In *Casey v. City of Federal Heights*, the Tenth Circuit held that it is clearly established that an officer may not tase immediately and without warning upon arriving on the scene where another officer appears to have control. 509 F.3d 1278, 1286 (10th Cir. 2007). In *Casey*, Officer Lor arrived at the scene of a physical struggle between a nonviolent offender and another officer. *Id.* at 1285. She deployed her taser within two minutes of arriving on the scene and without warning. *Id.* (explaining that the use of a taser without warning was "especially troubling."). She did not know the reason for the struggle. *See id.* at 1285–86. The Tenth Circuit held her actions were unconstitutionally excessive and denied the officer qualified immunity. *Id.*

The situation in *Casey* was almost identical to the situation Stotler faced. Stotler arrived on a scene where he did not know what the reason was for Sigg's encounter with law enforcement and seconds later tased without warning an unarmed elderly man who was surrounded by other officers. If anything, the scene Stotler encountered was less

---

[2] The Supreme Court has never held that circuit precedent may be a dispositive source of clearly established law, opting instead to assume without deciding that it might. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citing *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015)), which cited *Carroll v. Carman*, 574 U.S. 13, 17 (2014), which, in turn, (cited *Reichle v. Howards*, 566 U.S. at 665-66); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). But the Tenth Circuit has, holding that a "constitutional right is clearly established when a Tenth Circuit precedent is on point, making the constitutional violation apparent." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017).

volatile than the one Officer Lor encountered in *Casey,* when she saw another officer was engaged in a physical struggle with Casey. The scene Stotler encountered was more relaxed—so relaxed that two officers on the scene were holstering their weapons when Stotler, without warning, fired his taser. Doc. 54 at ¶¶ 47, 49. In fact, Sigg appeared to be peaceably complying with competing officer demands as he raised his hands in response to one officer's request and simultaneously trying to get down to appease Stotler. And Stotler's commands to "get down" were not a warning that Sigg would be tased. *See Casey*, 509 F.3d at 1285.

The Tenth Circuit has reiterated that "using a taser without providing an adequate warning against a misdemeanant who [has] ceased actively resisting [is] unconstitutional." *Emmett v. Armstrong*, 973 F.3d 1127, 1137 (10th Cir. 2020). In *Emmett*, Officer Armstrong had already tackled and subdued the plaintiff, who was on his back, when Armstrong tased plaintiff mid-warning that he was going to be tased. *Id.* at 1136. Thus, he gave Emmett no time to comply with commands and avoid the taser. *Id.* The facts suggested that Emmett had been subdued for roughly 10 seconds before he was tased. *Id.*

Stotler says that all Tenth Circuit case law is distinguishable. For instance, he contends that Sigg was not a misdemeanant, but had committed felony traffic infractions as he fled through town. Doc. 48 at 14; Doc. 58 at 13–14. But even if Sigg committed felony traffic infractions when he did not pull over immediately, it makes no difference. The officer in *Casey* admitted she had no idea what the target's offense had been or why there was a struggle when she tased him. 509 F.3d at 1285. So too did Stotler admit that he had no idea what Sigg's offense was when he tased him. In other words, characterizing Sigg's conduct after the fact as felonious does not excuse tasing him under the circumstances. *Contra* Doc. 48 at 14–15 (citing a factually distinguishable Eleventh Circuit case).

Stotler also says that this situation differs from *Casey* and *Emmett* because he had already given verbal commands—five of them—to Sigg and Sigg did not comply. Doc. 58 at 13. But Stotler's and the other officers' conflicting verbal commands were within ten seconds of each other, the video confirms that Sigg was complying with some commands (his hands were up) while he was attempting to comply with the others (he was attempting to get on the ground), and none of the officers—including Stotler—warned Sigg he would be tased. *See Emmett*, 973 F.3d at 1137 (emphasizing that officers must warn a target that he

14

needs to comply with the commands or else be tased). This constitutes a violation of the law that the Tenth Circuit, in *Casey* and *Emmett*, has held is clearly established. As a result, Stotler is not entitled to qualified immunity.

## B

The Board of County Commissioners of Allen County, Kansas moved for summary judgment.[3] Doc. 49. A municipal entity, or an officer in his or her official capacity, may be held liable under 42 U.S.C. § 1983, but not by way of respondeat superior. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988). Instead, a plaintiff seeking to impose liability on a local government must establish that the harm-causing conduct was undertaken pursuant to an official municipal policy or custom. *See Monell*, 436 U.S. at 691; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). The Tenth Circuit has "recognized as policies meeting this standard" those that "aris[e] from a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle v. Beckham Cty. Bd. of Cty. Comm'rs*, 962 F.3d 1204, 1239–40 (10th Cir. 2020) (internal citations and quotation marks omitted).

Sigg attempts to impose municipal liability in two ways. He alleges that the County failed to train their employees—Stotler, in particular—on tasers. Doc. 55 at 20–21; *see also* Doc. 45 at ¶ 4.a.ii. And he alleges the County ratified Stotler's conduct. Doc. 55 at 20–21. Both efforts fail.

## 1

Sigg first seeks to impose liability for failure to train. That is a very difficult task. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (recognizing a "municipality's culpability for a deprivation of rights is at its most

---

[3] Sigg sued Sheriff Murphy in only his official capacity and has made no claims against him in his personal capacity. His presence as a defendant is superfluous. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). As a result, he is dismissed from this case. .

15

tenuous where a claim turns on a failure to train"). Even viewing the facts in the light most favorable to Sigg, he cannot establish the County failed to train Stotler or anyone else on the use of a taser.

Two conditions—mental state and causation—must be met before failure-to-train liability may be imposed. *Schneider v. Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). As to mental state, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees will come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To constitute deliberate indifference, the risks of failing to train must be so immediately apparent, in light of actual or constructive notice that the failure is substantially certain to cause constitutional harm, that the final policymaker's refusal to address the shortcoming is the functional equivalent of a conscious decision to violate the Constitution. *See Connick*, 563 U.S. at 61–62; *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). And as to causation, the inadequate training policy must be the "moving force" that "actually caused" the deprivation at issue. *See Canton*, 489 U.S. at 391; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 412 (1997) (noting there must be so strong a connection between the inadequate training and the constitutional deprivation that a court can say "this officer was highly likely to inflict the particular injury suffered").

Sigg's failure to train claim cannot succeed because he does not have any facts to show the County acted with deliberate indifference or that inadequate taser training caused his injury. Allen County deputies, including Stotler, receive approximately 560 hours of police academy training and separate, additional training that leads to taser certification. Sigg's expert does not state that this taser training is generally inadequate, only that Stotler failed to follow his training. Doc. 50-7. And Sheriff Murphy agrees with that assessment. Doc. 54-7 at 2. A municipality cannot be held responsible for one of its officers acting in contravention of its training. *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989); *Murphy v. City of Tulsa*, 950 F.3d 641, 651–52 (10th Cir. 2019).

Sigg counters that Stotler tased another person who was operating a motor vehicle two months before tasing Sigg, so the County knew or should have known that Stotler was not properly trained on his taser. Doc. 55 at 24. And the County was deliberately indifferent to that fact, Sigg says, because it did not reprimand or retrain Stotler. *Id.* That argument fails to establish that the prior incident was unlawful or in

contravention of the County's policy. Doc. 59 at 8. Yet even if it was, a single incident is legally insufficient to establish a "pattern" indicative of deliberate indifference. *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019).

Sigg also fails to prove causation. Even if the County did not sufficiently train Stotler or failed to provide him a copy of the County's policy on using a taser, that alone is not enough to establish the County's liability because there is no link showing that Stotler's inadequate training caused Sigg's injury. *See Canton*, 489 U.S. at 390–91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.").

Indeed, there is evidence to suggest factors other than training may have been at play. For example, Stotler knew that Sigg was pulling into his auto dealership and that the dealership had recently—less than three weeks earlier—repossessed his vehicle. As a result, a jury might infer he was motivated to exact revenge when he acted in contravention of his agency's use-of-force policy. *See, e.g., Valdez v. Motyka*, 804 F. App'x 991 (10th Cir. 2020) (affirming a district court's denial of qualified immunity where the disputed facts suggested that the officer may have been acting out of vengeance); *Porro v. Barnes*, 624 F.3d 1322, 1328–29 (10th Cir. 2010) (holding an officer's tasering a detainee who was not a threat was a direct violation of policy but not sufficient to impose municipal liability).

**2**

Sigg's alternative theory, that the County is liable because it ratified Stotler's conduct, also fails. For one thing, he did not preserve it. For another, the facts are insufficient to show ratification.

Sigg failed to preserve the theory that the County was liable because it ratified Stotler's conduct in the pretrial order. *See* Doc. 59 at 13. A pretrial order "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d). Specifically, "'claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint.'" *Murphy-Sims v. Owners Ins. Co.*, 947 F.3d 628, 631 (10th Cir. 2020) (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)). When deciding whether a pretrial order includes a particular claim, a court must construe the pretrial order liberally "'to cover any of the legal or factual theories that might

be embraced by [its] language.'" *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)). But the primary purpose of the pretrial order is to "avoid surprise by requiring parties to 'fully and fairly disclose their views as to ... the real issues of the trial.'" *Id.* (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

Sigg did not assert a ratification theory in the pretrial order. *See* Doc. 45. The Tenth Circuit and district courts within the circuit have frequently declined to consider claims or defenses that were not in the pretrial order. *E.g., Cortez*, 460 F.3d at 1276–77 (holding statute of limitations defense was waived); *Azim v. Tortoise Cap. Advisors, LLC*, 718 F. App'x 600, 603–04 (10th Cir. 2017) (affirming the district court's holding that the plaintiff waived his Title VII and Section 1981 retaliation claims); *Elephant Butte Irr. Dist. of New Mexico v. U.S. Dep't of Interior*, 538 F.3d 1299 (10th Cir. 2008) (affirming the district court's holding that breach of contract claim was waived in the pretrial order and that "bootstrap[ping]" via a statutory interpretation theory did not preserve it); *Swearingen v. Pleasanton Unified Sch. Dist. 344*, 641 F. Supp. 3d 1141 (D. Kan. 2022) (finding theory of liability was waived), *Myrick v. Husqvarna Pro. Prod., Inc.*, 508 F. Supp. 3d 846, 860 (D. Kan. 2020) (same), *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1341 (D. Kan. 2008) (same).

Sigg claims that the pretrial order incorporates facts that "the Sheriff's office […] treated taser usage as something to ignore or laugh at." Doc. 55 at 27. That is insufficient to preserve a ratification theory of liability. Instead, it appears to be support for the only claim he preserved: failure to train. As a result, Sigg cannot avail himself of a theory of liability that he did not preserve. *See* Fed. R. Civ. P. 16(d).

But even if Sigg had preserved the ratification theory, the claim would fail as a matter of law. A municipal entity becomes liable by way of ratification only "if a subordinate's position is subject to review by the municipality's authorized policymakers and the authorized policymakers approve a subordinate's decision and the basis for it." *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009). The thrust of this rule is that—by accepting the subordinate's decision and reasoning—the final policymaker has "render[ed] a final decision chargeable to the municipality." *Butcher v. McAlester*, 956 F.2d 973, 977 n.2 (10th Cir. 1992).

Sigg contends that the County ratified Stotler's conduct because Stotler's colleagues made approving comments and laughed about the incident and because the Sheriff did not reprimand him for tasing Sigg. Doc. 55 at 19, 25. He is incorrect.

Even viewed in the light most favorable to Sigg, this sparse evidence is legally insufficient to conclude that the Sheriff ratified Sigg's conduct. To begin with, the other officers' responses when learning of Stotler's tasing of Sigg do not suggest that the Sheriff ratified Stotler's conduct. *Contra* Doc. 55 at 27–28. None of them were a final policymaker. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010) (explaining that a ratification claim requires evidence that the final policymaker knew and approved of the decision and the basis for it).. There is no evidence that the Sheriff was aware that Stotler's colleagues laughed or (allegedly) approved his actions at all. The Sheriff's own reaction to Stotler's tasing was simply "let it go." There's no evidence that the Sheriff knew of Stotler's reasons for tasing Sigg, nor that he accepted them. And a failure to investigate or reprimand Stotler for tasing Sigg does not show that the Sheriff ratified his actions. *See Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (explaining that failure to discipline an officer after an alleged constitutional violation is insufficient to establish a causal connection to that constitutional violation); *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x. 774, 787 (10th Cir. 2019) ("[f]ailing to adequately investigate or punish does not count as ratification"); *cf. Praprotnik*, 485 U.S. 112, 130 (1988) ("Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy," and neither is "the mere failure to investigate the basis of a subordinate's discretionary decisions."); *Kibbe v. Cty. of Springfield*, 777 F.2d 801, 809 n.1 (1st Cir. 1985) (holding failure to discipline a subordinate, without more, does not amount to ratification for purposes of municipal-policy liability). In fact, the Sheriff's subsequent testimony suggests that he believed Stotler's conduct contravened the training he received, so was neither authorized or commendable. Doc. 54-7 at 2.

* * *

In sum, Sigg could not show that the County failed to train Stotler. Nor could he show that the County ratified Stotler's conduct, even if he had preserved that argument. And without a failure-to-train policy

or ad hoc ratification, Sigg has no way to attach liability to the County. Accordingly, its motion for summary judgment is granted.

### III

For the foregoing reasons, Stotler's motion for summary judgment, Doc. 48, is DENIED, and the County and Murphy's motion for summary judgment, Doc. 49, is GRANTED.

It is so ordered.

Date: August 1, 2024   　　　　　　　　 s/ Toby Crouse
　　　　　　　　　　　　　　　　　　　　 Toby Crouse
　　　　　　　　　　　　　　　　　　　　 United States District Judge